Filed 4/12/16  In re A.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.H. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E064839 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1300527) |
| v. | OPINION |
| R.W., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

R.W. (mother) appeals from the juvenile court's orders denying her Welfare and Institutions Code section 388[1] petitions and terminating her parental rights with respect to her three children. Mother contends the trial court abused its discretion by denying her section 388 petitions without an evidentiary hearing.[2] Finding no abuse of discretion, we affirm the challenged orders.

I

FACTS AND PROCEDURAL BACKGROUND

A.      *Jurisdiction and Removal*

Mother and her three young children, Aa.H., An.H., and Ar.H. (the children) came to the attention of the Riverside County Department of Public Social Services (the Department) in May 2013, by way of a referral for general neglect. Mother and the children were homeless. They had been staying at a motel on a voucher, and had been seen digging in the trash and lying on the stairs after the hotel voucher expired. Mother admitted she had no place to stay and no family or friends she could contact for help. Mother had no money and no baby formula for her youngest child. She had not been taking her children to the doctor for checkups. Father admitted to seeing the children

---

[1] Unlabeled statutory references are to the Welfare and Institutions Code.

[2] Mother's challenge to the order terminating her parental rights is based on the success of her challenge to the court's denial of her section 388 petitions. She asserts that if the orders denying her petitions are reversed, the later order terminating her parental rights must also be reversed.

despite a restraining order prohibiting him from contact with mother. Father used marijuana, had a criminal record, and was on probation.[3]

The Department placed the children in protective custody and filed a dependency petition alleging mother was transient and unable to provide her children with adequate food, clothing, medical treatment, and protection. The petition also alleged that mother abused marijuana while supervising her children, had a history of domestic violence with father, and had a history with the San Bernardino County Children And Family Services as a result of allegations of emotional abuse and general neglect. At the time of the petition, Aa.H. was two years old, An.H. was 19 months old, and Ar.H. was eight months old.

In the jurisdiction and disposition report, the social worker noted the children had been returned to mother's care. Mother reported she was diagnosed as having depression and anxiety. She reported having a medical marijuana card and using marijuana to address her mental health issues. The social worker provided mother with referrals for domestic violence counseling, individual counseling, and a psychotropic medication evaluation.

On June 10, 2013, the juvenile court found the allegations in the petition true, permitted mother to retain physical custody of the children, and ordered the Department to provide her with family maintenance services. Mother's case plan included domestic

---

[3] Father is not a party to this appeal.

violence and parenting programs, counseling, substance abuse assessment and testing, and a psychotropic medication evaluation.

About a week later, on June 25, 2013, the Department took the children into protective custody. Two days later, the Department filed a supplemental dependency petition alleging mother had left the children without adult supervision on several occasions and had failed to enroll in any case plan services. The executive director of the shelter facility in which mother was residing had reported that mother had "repeatedly left the very young children alone in their residence, without any supervision." The director reported that it was typical for mother to leave her children unsupervised while she went to the store, that mother had left them alone even after having been instructed not to, and that the children were often seen wandering around the facility by themselves.

On June 28, 2013, the court detained the children and the Department placed them in a foster home. The court ordered mother to submit to a psychological evaluation.

In the July 25, 2013 supplemental jurisdiction and disposition report, the social worker stated that mother "consistently disregarded my directives to provide appropriate supervision for her children. Her blatant disregard for her children's safety continues to put them at risk." The social worker described numerous reports she had received about mother leaving her children unsupervised. Aa.H. was often found in the parking lot and she was twice found on the main street. On one occasion, Aa.H. walked into the shower when a male resident was taking a shower. Mother told the social worker she had left her children unsupervised "only . . . like five times and it was so that I can get them

4

something to eat.  If I didn't you would have an issue with me not feeding them."  The social worker observed that mother had failed to take advantage of the services provided to her, and that mother had unresolved mental health issues.

Subsequently, the social worker received a letter, dated August 19, 2013, from Victorious Living Institute, a home for women, reflecting mother was residing in that facility and receiving daily life skill training, drug and alcohol counseling, anger management, relapse prevention, parenting, and spiritual studies.  The Department amended its supplemental petition to strike the allegation that mother had failed to enroll in any case plan services.

On August 27, 2013, the court found true the supplemental allegation that mother frequently left the children unsupervised.  The court removed the children from mother's custody.

B.    *The Reunification Period*

Mother was given reunification services for about a year and a half, from June 2013 to November 2014.  Mother did make some progress on her case plan.  She completed parenting and domestic violence programs and provided negative drug test results.  However, during the entirety of the reunification period, mother was unemployed, had difficulty maintaining housing, and failed to resolve her mental health issues.

In total, mother resided in four shelter facilities, two motels, and had spent time living with a relative.  In October 2014, mother reported that she was asked to leave a

5

domestic violence shelter in Riverside County because she was trying to establish contact with father. As of November 2014, the social worker did not know where mother was living. She had moved out of her most recent shelter and did not provide the social worker with another address.

Initially, mother was visiting the children during the review period on a consistent basis, twice a week for four hours, and the visits were going well. The foster mother would transport the children to mother's shelter facility. However, starting in October 2014, mother stopped making efforts to visit the children. Mother was living in a new shelter and was not taking advantage of the bus passes the social worker provided to assist her in meeting the foster mother at a "halfway" point.

Mother also failed to participate in case plan services designed to address her mental health problems. In December 2013, mother's evaluator, Dr. Robert Suiter, diagnosed mother with Bipolar I Disorder and opined she was "in need of individual psychotherapy and the administration of psychotropic medications." He observed mother was a "poor and unreliable historian" who had difficulty recounting how her children had been removed from her care and "could not even state reliably who is the father of her three children." Dr. Suiter found mother's statements regarding her history of marijuana use particularly unreliable. He noted that mother "may have some mental confusion and have some predisposition to experience hallucinations." He concluded it would be "overtly detrimental" to return the children to her care and that she was unlikely to benefit from reunification services.

In the 12-month status review report dated August 13, 2014, the social worker recommended terminating mother's reunification services. One of the main reasons for this recommendation was mother had "yet to address her mental health issues." Mother believed the children's true father was Lance Gross, a television actor who lived in Los Angeles. She believed that father had stolen Mr. Gross's identity and was impersonating him in order to stalk her. The social worker was concerned about mother's "mental stability," noting that mother "has built an elaborate fantasy and appears to be delusional about her relationship with the actor, Lance Grossman [*sic*]." Despite being given three referrals for counseling and a psychotropic medication evaluation, mother failed to participate in counseling regularly and failed to attend a medication evaluation.

On September 23, 2014, the court ordered the Department to refer mother to counseling services and a medication evaluation. On November 5, 2014, the social worker filed an addendum report noting mother had been given referrals to at least four different therapists and three psychiatrists for medication evaluations, and had nevertheless failed to make "any efforts to engage in services."

At the review hearing on November 13, 2014, the court observed that mother still had not participated in the court-ordered medication evaluation. The court found mother had not made satisfactory progress on her case plan, terminated her reunification services, and set the section 366.26 hearing.[4]

---

[4] In a previous order, we denied mother's writ petition challenging the juvenile court's decision to terminate family reunification services and set the section 366.26 hearing. (Case No. E062341.)

7

C.	*The Section 366.26 Report and Mother's Section 388 Petitions*

On February 23, 2015, the Department placed the children in the home of the prospective adoptive parent. The children were doing well in the home and had established a healthy parent-child bond with the prospective adoptive parent, who was providing the children with "nurture, emotional support and a stable home." The prospective adoptive parent desired to adopt all three children and keep the siblings together. She had enrolled the children in "head start and a daycare program."[5]

In the section 366.26 report filed on February 27, 2015, the social worker reported that mother remained unemployed and had moved in with father. Mother told the social worker she needed "another year to get herself together." Mother wanted the court to give her an opportunity to find stable housing and employment.

Mother was attending the majority of the visits, which had been reduced from twice a week to twice a month. By all accounts, mother acted appropriately and the children appeared comfortable with her.

In the section 366.26 report filed on September 1, 2015, the social worker reported that mother was still unemployed and had no income. Mother had informed the social worker she was no longer with father and was living in a domestic violence shelter. According to the social worker, mother called the children on a weekly basis but had missed many scheduled visits.

---

[5] The Department wanted to assess the children's maternal grandmother for prospective adoptive placement, but the maternal grandmother told the Department she could not accommodate the children in her current living situation.

The social worker remained concerned about mother's mental health. Mother was pregnant and believed the father was the professional NBA athlete Dwayne Wade. Mother also believed Mr. Wade may be the children's father as well. She said she had attempted to notify Mr. Wade that she was pregnant, but discovered he had a wife and children. Mother had still not taken any steps to seek psychological assistance or participate in a medical evaluation.

On September 14, 2015, mother filed a section 388 petition as to each child, requesting six more months of reunification services. Mother alleged her circumstances had changed since the court terminated reunification services in that she had "worked very hard to stabilize her living situation, stabilize any mental health issues, and . . . improve her parenting capabilities." Mother further alleged that more reunification services would be in the children's best interests because she had "never given up hope in having the children returned to her care." She stated she had addressed the issues supporting jurisdiction—she had stopped using marijuana, found stable housing, no longer claimed there was another father, had addressed the domestic violence issues with father, and had participated in therapy and parenting classes.

Mother filed the following supporting documentation with the court: letters from "Mama's House," a home for pregnant women, confirming she was living at the shelter (and could live there for up to three months after the birth of her baby) and was involved in various classes and therapy sessions; certificates showing she had completed parenting classes through "Birth Choice of the Desert," "Triple P," and "Native Challenge," and a

9

job search workshop through "Desert Best Friend's Closet"; a letter from one of her instructors describing her as motivated, enthusiastic, and prepared; documentation that she had obtained CalFresh aid; a certificate showing she had completed a domestic violence class in June 2014; a negative drug test from October 2015; and her own declaration stating she had been clean and sober for 90 days.

Mother also submitted the results of a psychological evaluation she had attended on September 24 and October 1, 2015. Her evaluator, Dr. Jamie Kirkpatrick, observed that she was in need of outside support and a stable place to live after Mama's House. Dr. Kirkpatrick could not "ethically advise as to whether [mother] should have her children returned to her," but observed that if mother did not obtain additional support, "her prognosis [was] poor."

The court summarily denied mother's section 388 petitions on the ground that providing more reunification services would not promote the children's best interests.

D.   *Termination of Parental Rights*

The court held the section 366.26 hearing on November 9, 2015. Mother testified she had been living in a women's shelter for the past six months. She apologized for having made accusations that father was not the children's father. She described her visits with the children. She used to see them twice a week, but her visits had been reduced to twice a month. Mother testified she was concerned because her children used to call her "Mommy," but had started calling her "Mommy R[ ]." Nevertheless, she felt she had a deep bond with her children. They would run up to her and hug and kiss her at

10

the beginning of each visit and were sad when each visit ended. Mother testified that her goal would be to "in some way come together [with father] and raise our children like two responsible adults." Mother stressed that she "would do anything for [her children]" and "love[s] them with all [her] heart."

The children's maternal grandmother testified that she had attended at least four to six visits, and every time the children would hug and kiss mother. Maternal grandmother stated it was apparent that the children loved each other and loved mother.

## II

## DISCUSSION

Mother contends the juvenile court abused its discretion by summarily denying her section 388 petitions. For the reasons stated below, we find no abuse of discretion.

"Section 388 permits '[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court' to petition 'for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court' on grounds of 'change of circumstance or new evidence.' (§ 388, subd. (a).) 'If it appears that the best interests of the child may be promoted by the proposed change of order, . . . the court shall order that a hearing be held. . . .' [Citation.] Section 388 thus gives the court two choices: (1) summarily deny the petition or (2) hold a hearing. [Citations.] In order to avoid summary denial, the petitioner must make a 'prima facie' showing of 'facts which will sustain a favorable decision if the evidence submitted in

support of the allegations by the petitioner is credited.' [Citations.]" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.)

There are two requirements for a prima facie showing:  The petitioner must show that (1) there is a genuine change of circumstances or new evidence, and (2) a modification of a previous order would be in the best interests of the child.  (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  In considering whether such a showing has been made, the court may consider, among other things, "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531-532.)

We review a summary denial of a hearing on a modification petition for abuse of discretion.  (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)  "Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*Ibid.*)

The juvenile court's decision to summarily deny mother's section 388 petitions was not arbitrary, capricious, or patently absurd.  It is doubtful mother made a prima facie showing of a genuine change of circumstances or new evidence.  As of the time of her petitions, she had not found stable housing, resolved her mental health issues, or been

12

clean and sober for a significant amount of time. While it is true mother had found temporary housing at Mama's House, she was only permitted to stay at that shelter for a maximum of three months after her child was born. She had completed a job skills class, but she did not assert she had obtained employment. Without a job or other asserted income, it is unclear how mother would provide a stable residence once she could no longer stay at Mama's House.

Also, while mother alleged her mental health issues were resolved, it is not clear how that could be the case. Mother did not allege that she had finally completed the court-ordered medication evaluation. She was involved in therapy, according to her petitions, but there was no indication of her progress. Furthermore, the psychological assessment she attached to her petitions indicated she was still suffering from unresolved mental health issues. Mother's evaluator, Dr. Kirkpatrick, was unable to recommend returning the children to her care and observed that without more support her prognosis was "poor." Finally, although mother's alleged 90 days of sobriety is a commendable step in the right direction, "[i]t is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9.)

Mother argues that "[i]ndigency, by itself, does not make one an unqualified parent." While this is true, poverty was not the only issue mother struggled with as a parent. Mother also demonstrated an inability to properly supervise her children and an unwillingness to resolve her mental health issues. Unfortunately, the record lacks

13

evidence that mother's inability to provide a safe and stable home for herself, let alone her children, has been resolved.

Even assuming a genuine change of circumstance, mother failed to make a prima facie showing that six more months of reunification services was in the children's best interests. The problems that led to this dependency were mother's inability to provide a safe and stable environment for her children, as well as her mental health issues and use of marijuana while parenting. Such problems are not easily solved or ameliorated, and mother had only just begun to take steps in that direction. More importantly from the perspective of the children's best interests, the children had developed strong bonds with their prospective adoptive parent. The record shows they were thriving in their prospective adoptive home, and that mother's efforts to visit them decreased dramatically starting in October 2014.

Mother had nearly two years to reunify with her children, but she was unable to do so. Once the court terminated services in November 2014, the children's interests in the permanency and stability they had found outside mother's care was paramount. "After the termination of reunification services . . . 'the focus shifts to the needs of the child for permanency and stability.'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Mother did not allege in her section 388 petitions how returning the children to her care would benefit the children in any way. Mother may well feel a deep bond with her children, as she asserted in her section 388 petitions; however, we cannot conclude the juvenile court acted unreasonably or arbitrarily in finding it would be detrimental to disturb the bond

14

between the children and their prospective adoptive parent and to introduce further delay in the process of adoption. As such, summary denial of the section 388 petitions was proper.

## III

## DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH

J.

We concur:

McKINSTER
          Acting P. J.

MILLER
                    J.

15